## GUNTER v. SARTIN.

No. 18419. Opinion Filed June 18, 1929.

C. Guy Cutlip and Thos. J. Horsley, for plaintiff in error.

D. G. Hart and H. H. Edwards, for defendant in error.

BENNETT, C. The parties appear here as in the trial court.

Chas. W. Gunter, plaintiff, sued John W. Sartin in district court of Seminole county to recover on a promissory note for $509.60, dated March 10, 1921, payable July 10, 1921, bearing interest at six per cent. The petition was in the usual form and referred to the copy of the note declared on which was thereto attached.

The defense was a general denial, and in addition an allegation that plaintiff, through his authorized agent, procured the execution of said note by certain false and fraudulent representations to the effect that John M. Cloud, who was at that time in business with and a partner of defendant, had agreed to sign the same and had requested the defendant to sign same, but for which

the defendant would not have executed same; also that the note was for premium on an insurance policy, which was never delivered, and that therefore the note was without consideration. To this verified answer was filed a denial for reply. There was a trial to a jury, whose verdict was for defendant, from which plaintiff appeals.

Counsel for plaintiff has saved us from considering numerous points raised by his exceptions by frankly stating in his brief on page 4 that "there is but one sole contention for reversal of this case, which we will present to this court for consideration, and that is that the verdict of the jury is not sustained by the evidence," and he quotes from the case of Gergens v. McCollum, 27 Okla 155, 111 Pac. 208, as follows:

"The Supreme Court will not disturb a verdict where the evidence is conflicting, or where the verdict is reasonably supported by the evidence: but, where, from an inspection of the record, it is apparent that the evidence did not reasonably sustain the verdict of the jury, this court will set such verdict aside and direct a new trial.—Ranney-Alton Co. v. Hanes et al., 9 Okla. 472. 60 Pac. 284."

This case sets forth a familiar principle, from which it is not necessary to depart.

The evidence in this case, while not entirely clear in all its details, is comparatively short, and the salient features of which may be stated in substance as follows:

Mr. C. Guy Cutlip, witness for plaintiff, identified the note sued upon as a copy of the note which was placed with him as an attorney for collection; the original note was destroyed when a building in which his office was located burned in October, 1925; the copy of the note was introduced in evidence. It appears to be signed by Sartin Motor Co., by John W. Sartin. Witness has no independent recollection of the terms of the note other than from an observation of the copy, and has no recollection of having checked the copy with the original; that he really understood that the said note was signed by John W. Sartin, but it may have been signed as shown by the copy. Plaintiff rests.

John W. Sartin, defendant, said that he had a transaction with Chas. W. Gunter, through his agent, Mr. Curry; that witness and Mr. Cloud were running the Ford Motor Company; had quite a bit of talk with Mr. Curry in regard to a joint policy insuring the lives of Mr. Cloud and witness against loss to the business of the company. Mr. Curry procured a $10,000 policy for such purpose to be written up and sent down for examination, and Mr. Cloud sent it back to the company. Policy was not accepted, and five or six weeks later Mr. Curry came back, and witness was out of the garage at the time, and Curry came out on the road where witness was and said: "Mr. Cloud had agreed to accept the policy if witness would, and that if witness would give a note he would carry it for the present, and Mr. Cloud had agreed to sign if witness would. So I did so. * * *" And when witness came into the garage Mr. Cloud had made other arrangements and refused to sign the note.

"Q. Under what arrangements did you get the policy? A. He sent it down on approval; if we wanted it, keep it, and if not return it back to the company. Q In signing this note, Mr. Sartin, I will ask you if you signed it Sartin Motor Company or John W. Sartin? A. John W. Sartin, only. * * * Q. Was the policy of insurance ever delivered? A. Not after we sent it back; we had it one time. * * *"

Cross-examination:

"Q. Did you sign the note before or after the policy was sent to you? A. After. * * * Q. What, if any, consideration did you give for the policy when it was first sent? A. We just decided we didn't want it and sent it back; that was the understanding, sent for approval. * * * Q. When you first saw the policy after you had returned it to the home office in Pennsylvania, was it over here in the office of the motor company? A. When I saw it again? Q. Yes. A. I have never seen it. * * * Q. You say the reason you signed that note was that he told you Mr. Cloud was willing to sign it? A. That Mr. Cloud had agreed to accept the policy and would sign it. * * * Q. Did you ever agree to pay the note after that or promise to pay it? A. No, sir; I never did. Q. You never wrote any letters to Mr. Gunter about the note? A. I don't know; I don't have any recollection of it. Q. If you did do that, you are possibly mistaken in all of what you said about the note? A. No, sir; I know I signed it on the road."

Witness says his company was called the Sartin Motor Company. Has no recollection of writing Mr. Gunter on or about November 2, 1921, that because of crop conditions he would be unable to pay the note. That the handwriting of a letter exhibited to him looks like his own, but that the signature does not. Has no recollection of having written the letter. Witness signs his name to be exhibited to the court and jury. That he signed the note for a premium on the policy after the policy had been returned to Philadelphia. He has no recollection of having written Mr. Gunter regarding payment

of the note in question and does not recall certain exhibits which are presented to him. Does not remember the date that the policy was returned to the company in Pennsylvania, because he did not return it himself, but it was done by Mr. Cloud.

"Q. How long after you sent the policy back to the company was it before, in your best judgment, Mr. Curry came down to see you? A. I couldn't say anything as to time; I would say four to six weeks, I wouldn't say positive."

Redirect:

"Q. I will ask you, Mr. Sartin, if you at any time agreed to accept this policy and pay for it except the agreement at the time you signed the note? A. No, sir. Q. Did you have correspondence with them with reference to an adjustment? A. I didn't; all the correspondence was done by Mr. Cloud."

John M. Cloud, witness for defendant: Witness was working with Mr. Sartin in the garage. That he cannot be positive about dates, but Mr. Curry was talking to defendant and himself about a joint policy on the lives of Sartin and himself for the protection of the firm. It did not appeal to witness. Mr. Curry insisted that the policy was needed and that he would like to write it, and asked witness if he had seen such a policy, to which witness answered that he had not. Then he asked if witness would consent to have one of that kind written and sent on approval, but witness felt they were not able to carry the policy at the time. Mr. Curry said that he would write one and send it for approval, and if it were wanted, it could be paid for, and if not, it could be returned and there would be no charge whatever. That the policy was sent with that understanding. When the policy arrived witness kept it something like a day or two and returned it to Oklahoma City. Did not send it to the Penn Mutual, but sent it to the office at Oklahoma City. That the policy was mailed to witness and Mr. Sartin twice. The first time witness returned it to Oklahoma City, and the second time it was either returned to the company in Pennsylvania or to Mr. Gunter at Oklahoma City.

"Q. What conversation, if any, did you have with Mr. Curry when the note was presented for your signature? A. Well, when Mr. Curry came down after the policy had been returned, he came in and asked what the trouble was, or what was wrong with the policy, and we talked the matter over; I don't remember just the exact conversation, and he asked me if we were not going to keep the policy, and I told him no, we were not going to keep the policy, and there was something said about the premium running on the policy that would be due at that time and $25 would pay that, or if we wanted the policy canceled, if we wanted to cancel it at this time, there would be $25 and that would cancel the policy, so I refused to pay anything, I didn't think we owed anything, but finally we continued to talk about it and kept talking about the matter and I agreed if they would cancel the policy and Mr. Sartin agreed to cancel it we would pay the $25. We didn't owe anything, but I would pay the $25 if he wanted to cancel it, and for the $25 Mr. Curry agreed to take two Ford casings, and he took the casings and looked them over and set them down in the corner and agreed to take those for the $25, and I thought the policy was canceled. Q. What was next done with reference to the policy? A. Well, Mr. Curry was here two or three days working in and out, and he and another gentleman, and either at that time or shortly thereafter, I am not going to be positive as to the date because I don't have any definite recollection except the conversation after the note was signed. Mr. Curry and I was talking about the policy and he told me that Mr. Sartin had agreed to take the policy if it was agreeable to me, and would make a note for it, and I said, 'Mr. Sartin is at the head of this firm, and if it is agreeable to him, get him to sign the note.' Mr. Sartin was at this time out on the road. He went away, I refused to sign the note, he came back with the note signed and told me —(after certain exceptions) Mr. Cutlip (Curry) told me that Mr. Sartin had signed the note, and said for me to sign the note, but I refused to sign the note, but did try to get hold of the note and I wasn't able to do so. When Mr. Sartin came in I told him what the situation was about it, of course; what he told me wasn't able to state while ago. * * * Q. Did Mr. Sartin ever agree to accept this policy and pay for it in your presence? (After certain objections.) A. He never did in my presence; no, sir. Q. Did you ever get to see and read the note? A. No, sir; I never did. Well, I never got to see it except being held in Mr. Curry's hand. Q. Did Mr. Curry ever deliver the policy after it was sent back the second time before the note was made? A. He brought the policy and left it there. The policy was left in the office on my desk while he went to see Mr. Sartin. One day when he had been in the office it was left, it was never delivered to me, and I picked up the papers and give them to Mr. Curry. Q. He took it away? A. I give it to him. Q. That was after he got the note? A. Yes, sir. Q. Did you send word by Mr. Curry to Mr. Sartin that you wanted the policy and to sign the note? A. I did not. Q. And did you send word that if Mr. Sartin would sign the note you would sign it? A. No, sir."

Cross-examination:

"Q. What became of those casings? A. I couldn't swear. Q. You know as a matter of fact that Mr. Curry didn't get them? A. No, sir; I wouldn't say. * * * Q. You say those casings were in payment of the $25? A. Yes, sir. Q. When was that? A. Before he went out on the road. * * * Q. Where was the policy at the time you had the conversation about the casings? A. Mr. Curry had it. * * * Q. The second time you returned the policy, had Mr. Sartin made any note for it? A. No, sir."

Witness is sure that the note was not signed by Mr. Sartin in the Ford office. Has no recollection of a conversation in which Mr. Curry said that if they did not wish the policy, they could let it run until July 1st and pay $25 and return the same for cancellation, but witness says after the note was signed Mr. Curry came down to see Sartin and witness and the question came up as to the policy and Mr. Sartin asked about the note and Mr. Curry said, "You need not rest a bit uneasy about that note."

"Q. What do you mean in this letter, 'The policy should have been canceled last July?' A. Because Mr. Curry told me he would cancel the policy. Q. Then there was an agreement that the policy was to be canceled? A. Yes, sir. Q. And the $25 was to enter into the cancellation? A. Not in the cancellation; he said that if we would pay $25 he would cancel it, and we agreed to pay it. * * * Q. Do you mean to tell the jury that an agreement was entered into whereby the note was to be settled and the policy canceled? A. Yes, sir; Mr. Curry agreed two or three times at any time we wanted to take the note up and let it go, and we never could get the return of the note and he would never get the $25."

Re-cross examination:

"Q. You heard him say that on the payment of the $25, why the note would be surrendered and the policy canceled? A. Yes, sir. * * * By the Court: Do you know how long this release, after this note was made until this release was signed—after the note was signed until this release you mention here was signed? A. I wouldn't be positive, but something, I am not going to say positive, it was two or three weeks, in 30 days, may be a little longer than that."

At this point plaintiff demurs to the evidence of the defendant and also moves for an instructed verdict, both of which are overruled.

The question squarely up to us now is whether there is any evidence which reasonably tends to support the verdict of the jury. The rule for our guidance is well marked out in the case of Chicago, R. I. & P. Ry. Co. v. Gilmore, 52 Okla. 296, 152 Pac. 1096, as follows:

"In ascertaining if a verdict is sustained by sufficient evidence, all the evidence before the trial court, including every reasonable inference therefrom, which tends to support the verdict is accepted as true."

Applying this rule to the evidence in this case with reference to the inducement of the contract, we have to accept as true the statement that when Curry approached Cloud he refused to accept the policy and sign the note. We have likewise to accept as true the statement of Sartin that he while on the road was approached by Curry, who represented that Cloud had agreed to accept the policy and sign the note for the premium, provided it were agreed to and signed by Sartin; also the statement of Sartin that he would not have signed the note but for reliance upon the truth of such statement. But one conclusion can be drawn from this evidence, if true, and that is that a fraud was perpetrated on these men.

Dealing with the other phase of the controversy, it must be accepted as true that this policy was sent down, not as a contract, but upon approval purely, and subject to acceptance or rejection of defendant. After examination it was properly returned by mail, either to the Oklahoma City office of the insurance company or to the home office of the company in Pennsylvania. It seems to have been sent down again, and presumably for the same purpose, as no other purpose is disclosed by the evidence, or at least that part of it favorable to the defendant, and it is again refused and returned by mail to the company. Thereupon Curry appears and the note sued on is executed under the circumstances outlined.

But later it seems that plaintiff, through his agent, strenuously insists that the policy had been issued for some time, and that a certain amount of protection had inured to the benefit of defendant, and he ought, therefore, to pay at least $25 as a consideration for the benefit of such protection up until the 1st of July, and that Curry finally agreed to accept two Ford casings, which were set aside to him, not because the defendant admitted the indebtedness, but to make an end of contention with respect thereto. This we must accept as entirely true, for the purpose of this decision, and it must be taken as true also that in consideration of this adjustment the note was to be surrendered and the policy canceled. It must also be taken as true that the policy was never delivered, accepted, and held by the defend-

ant, but .that the same was turned back on the two or three occasions when it was sent to him for the purpose indicated in this evidence.

As we read the record, there is no denial by Curry that the arrangement for the delivery of the automobile casings was made, although he was examined at length.

In the case of Stekoll v. Lebow, 96 Okla. 76, 219 Pac. 899, it is held:

"It is a well-settled rule of this court that where the testimony on any material issue is conflicting, and there is any competent evidence in the record reasonably tending to support the finding of the jury, this court will not review the evidence to ascertain where the weight lies, nor interfere with such finding."

To the same effect are Arbuthnot v. Boren, 102 Okla. 21, 225 Pac. 965; Chortney v. Curry, 99 Okla. 69, 225 Pac. 950.

Upon the question of fraud the duty of the court where the evidence is contradictory is clearly set out in Hope Natural Gas Co. v. Ideal Gasoline Co., 114 Okla. 30, 243 Pac. 206.

Defendant Sartin testified that Curry came out on the road and said Mr. Cloud had agreed to accept the policy and if he (Sartin) would give a note it would be carried for the present, and that Mr. Cloud "agreed to sign if I would, and so I did so," and on cross-examination he was asked:

"Q. You say the reason you signed that note was that he told you Mr. Cloud was willing to sign it? A. That Mr. Cloud had agreed to accept the policy and sign it."

We cannot, under this proof, hold that there was no evidence of misrepresentation.

Passing now to the second point, that the note was without consideration, if defendant's evidence is to be believed, he never at any time agreed to take over the policy, the premium of which is represented by the note sued on. The most that can be said is that he committed himself to pay $25, or to give two automobile casings, not, however, to pay this note, for he did not admit the obligation, nor to pay for the protection obtained from a policy which had never been delivered to him, but only to avoid wrangling over the matter; and the setting aside of the casings for plaintiff was not in terms denied by him. From the setting aside of these casings and from the failure of plaintiff to deny same, in terms, we think an inference may be fairly drawn that plaintiff got the benefit of them; but, at any rate, this issue as to the $25, along with the

other issues in the case, was submitted by the court to the jury under instructions which are not the subject of criticism. The jury saw the witnesses, heard them testify; the trial judge, who had also full opportunity to observe the witnesses and to hear their testimony first hand, approved the verdict.

Without respect to what we might or might not think the essential facts are, under our theory of court procedure, the jurors are the triers of the facts, and in a law case, tried under instructions which are correct, we are bound by the findings unless we can say from an inspection of the record that there is no evidence reasonably tending to support the verdict and judgment.

For the reasons given, we hold that the judgment of the trial court is correct, and the same is affirmed.

TEEHEE, LEACH, FOSTER, and REID, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 2 R. C. L. p. 206; 1 R. C. L. Supp. p. 444; 4 R. C. L. Supp. p. 92; 5 R. C. L. Supp. p. 81; 6 R. C. L. Supp. 76; 7 R. C. L. Supp. p. 37. See "Appeal and Error," 4 C. J. §2834, p. 853, n. 61. "Insurance," 33 C. J. §771, p. 70, n. 83.